# UNITED STATES DISTRICT COURT
for the
## EASTERN DISTRICT OF WISCONSIN

*In the Matter of the Search of*

Case Number: 12-M-572

**Premises located at N39 W27051 Glacier Rd.,
Pewaukee, WI 53072.**

## APPLICATION & AFFIDAVIT FOR SEARCH WARRANT

I, John Klugewicz, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**Please Attachment A.**

located in the Eastern District of Wisconsin there is now concealed: **Please see Attachment B.**

The basis for the search warrant under Fed. R. Crim. P. 41(c) is which is (check one or more):

✓ evidence of a crime;
✓ contraband, fruits of a crime, or other items illegally possessed;
❏ property designed for use, intended for use, or used in committing a crime;
❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

Title 18, United States Code, Section 1344 (bank fraud); Title 18, United States Code, Section 1341 (mail fraud); Title 18, United States Code, Section 157 (bankruptcy fraud); Title 18, United States Code, Section 152 (concealing assets and false claims in bankruptcy proceedings)

The application is based on these facts:
Please see attached Affidavit.

✓ Continued on the attached sheet, which is incorporated by reference.
❏ Delayed notice of _____ days (give exact ending date if more than 30 days:_____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*
Name and Title: John Klugewicz, FBI Special Agent

Sworn to before me, and signed in my presence.

Date ___October 18, 2012. at 1:00 PM

City and state: Milwaukee, Wisconsin

*Judge's signature*
THE HONORABLE WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge
*Name & Title of Judicial Officer*

## ATTACHMENT A

### Places to be Searched

The premises located at N39 W27051 Glacier Road, Pewaukee, Wisconsin 53072, including all area of the residence and garages, the outbuilding and any sheds,vehicles and water craft located on the property. The residence is located at the intersection of Glacier Road and Parkside Lane. There is no visible house number affixed to the residence.

The residence is more particularly described as a two story, single family residence with a stone façade on the lower level and beige colored siding on the upper level. There is a wing with five separate garage doors attached to the residence as it is approached from the driveway.

The outbuilding is two story building, similar in construction to the residence. It has two garage doors.

Photographs of the residence and the outbuilding are attached as attachments A1 and A2.

18



Attachment 1

Attachment 2

## ATTACHMENT B

### Items to Be Seized

1. Records and evidence relating to violations of Title 18, United States Code, Section 1344(bank fraud); Title 18, United States Code, Section 1341 (mail fraud); Title 18, United States Code, Section 157 (bankruptcy fraud); Title 18, United States Code, Section 152(concealing assets and false claims in bankruptcy proceedings) between February 26, 2008 and the present, including:

2. Records in whatever form kept of stored, i.e. paper, computer, electronic, or any other data storage medium) for or relating to the following individuals and entities: Todd A. Brunner, Investment Specialists of Pewaukee, LLC, Investment Specialists & Management LLC, T&D Acquisitions, LLC, Outer Limits, LLC, Thundercat Acquisitions, LLC, Peeling Paint, LLC, Land & Sea Acquisitions, LLC, Land & Sea Sales, LLC, Bulldog Enterprises, LLC, Senior Community Center of Waupun, LLC, Senior Community Center Management of Waupun, LLC, including

   a. records reflecting indicia of identification

   b. financial records, including but not limited to bank statements, debit card receipts, canceled checks, credit card statements, receipts, and convenience checks, financial statements

   c. property records including but not limited to deeds of trust, property schedules, mortgage documents, property tax payments and receipts, utility bills and payments

   d. business records including but not limited to incorporation records

   e. tax returns and tax return information

   f. tenant records including address lists, rental contracts records of rent receipts

   g. telephone records

   h. travel records

   i. shipping records, lists and address labels

   j. calendars and diaries

   k. correspondence, mailings, notes, e-mails

19

3. Notary seals
4. Cash
5. Computers or storage media used in connection with the violations described above.
6. For any computer or storage medium whose seizure is authorized by this warrant and
   any computer or storage medium that contains or in which is stored records or information
   that is otherwise called for by this warrant (hereinafter COMPUTER):
   - a. Evidence of who used, owned or controlled the COMPUTER at the time the things
     described in this warrant were created, edited or deleted, such as logs, registry
     entries, configuration files, saved user names and passwords, documents,
     browsing history, user profiles, e-mail, e-mail contacts, "chat," instant messaging
     logs, photographs, and correspondence;
   - b. Evidence of software that would allow others to control the COMPUTER, such as
     viruses, Trojan horses, and other forms of malicious software, as well as evidence
     of the presence or absence of security software designed to detect malicious
     software;
   - c. Evidence of the lack of such malicious software;
   - d. Evidence of the attachment to the COMPUTER of other storage devices or similar
     containers for electronic evidence;
   - e. Evidence of counter-forensic programs (and associated data) that are designed
     to eliminate data from the COMPUTER;
   - f. Evidence of the times that COMPUTER was used;
   - g. Passwords, encryption keys, and other access devices that may be necessary to
     access the COMPUTER;
   - h. Documentation and manuals that may be necessary to access the COMPUTER
     or to conduct a forensic examination of the COMPUTER;
   - i. Records or information about the Internet Protocol addresses used by the
     COMPUTER;
   - j. Records or information about the COMPUTER'S Internet activity, including firewall
     logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

search terms that the user entered into any Internet search engine and the records of user typed web addresses;

k. Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing of typing); and any photographic form (such microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures or photocopies.)

The term "computer" includes all types of electronic, magnetic, optical, electromechanical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobiles phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer date can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, DC_ROM's and other magnetic or optical media.

21

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, John Klugewicz, having been duly sworn on oath, state as follows:

### Introduction and Agent Background

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal procedure for a warrant to search the premises located at N39 W27051 Glacier Rd., Pewaukee, Wisconsin 53072, occupied by Todd A. Brunner, further described in Attachment A, for the items described in Attachment B.

2.     I am employed as a Special Agent with the Federal Bureau of Investigation. I have been so employed since 1986. I am assigned to the Milwaukee Field Office, Eastern District of Wisconsin. My duties as a Special Agent include investigating violations of federal law, including various white-collar crimes such as bank fraud, wire and mail frauds, bankruptcy fraud and money laundering. I have received training regarding investigation of white-collar crimes, have participated in numerous investigations of white-collar crimes, and have served as the affiant for many applications for search warrants and seizure warrants.

3.     The information contained in this affidavit is based on my personal knowledge, information I have received during this investigation from other law enforcement officers, bank security officers, witnesses, and from an attorney in the Office of the United States Trustee, all of whom I believe to be truthful and reliable, and from financial records and documents I have obtained during this investigation, which I also believe to be authentic and accurate.

4.     Because I submit this affidavit for these limited purposes, I have not included every fact I have learned in this investigation.

### Background

5.     On June 5, 2011, Todd A. Brunner and his wife, Sharon Y. Brunner filed a Bankruptcy Petition in the United States Bankruptcy Court for the Eastern District of Wisconsin, Case No. 11-29064.

6.     On January 24, 2012, Todd A. and Sharon Y. Brunner filed a debtors' disclosure statement in connection with the bankruptcy case. I have reviewed the introduction to that

1

disclosure statement which was electronically signed by Todd A. and Sharon Y. Brunner and their attorney. The introduction provides a summary of Todd A. Brunner's real estate background and some of his conduct that precipitated this investigation.

7. The document provides the following information:

a. Brunner is engaged in a real estate business which involves the purchase and renovation of duplexes and single family homes. He acquires the homes at foreclosure sales, and after renovation either re-sells them, or retains them as rental properties.

b. Brunner's wife, Sharon Brunner, is employed at Oconomowoc Memorial Hospital and has no involvement in the real estate business.

c. Prior to the time of the bankruptcy filing, a large number of Brunner's properties were titled in the name of a limited liability company known as Investment Specialists of Pewaukee, LLC. Just prior to the bankruptcy filing, those properties were conveyed from the LLC to Brunner personally, resulting in a single Chapter 11 filing.

d. During the approximate nine-month period prior to filing the Bankruptcy Petition, Brunner formed two additional LLCs, known as Outer Limits Investments, LLC (Outer Limits) and Thundercat Acquisitions, LLC (Thundercat Acquisitions). During this time period, he conveyed properties which were subject to liens to Outer Limits in order to avoid exposing those properties to the judgments of creditors. He attributes that action to "bad advice."

e. During the same time period, Brunner conveyed properties that were not subject to any liens to Thundercat Acquisitions, in order to prevent those properties from being attached by subsequently filed liens.

f. During the course of the bankruptcy proceedings, the U.S. Trustee discovered additional properties titled in Brunner's name which were not disclosed on his bankruptcy schedules. Those undisclosed properties include, but are not limited to, four vacant parcels of land in an airstrip residential park in Bend, Oregon which Brunner had purchased with another individual.

g. Brunner's bankruptcy filing was precipitated by the failure of a business venture with an individual named Dennis Witthun. The venture involved the conversion of a building

2

in Waupun, Wisconsin, from a school into an assisted living residential care complex. Brunner guaranteed a loan from First Business Bank-Milwaukee for more than $2,000,000 and a loan from the Fond du Lac County Economic Development Corporation for $100,000 in order to generate construction funds for the project.

h. By mid-2010, the project funds were depleted. Both Fond du Lac County Economic Development Corporation and First Business Bank-Milwaukee sued Brunner on the guarantees, resulting in a $2,000,000 judgment in favor of First Business Bank-Milwaukee.

i.      Prior to filing the bankruptcy petition, Brunner hired Guardian Investment Real Estate, Inc. to manage his rental properties.

### Facts supporting findings of probable cause

8.      For the reasons set forth below, I submit that there exists probable cause to believe that between approximately February 6, 2008, and the present, Todd A Brunner has engaged in conduct which constitute violations of Title 18 United States Code, Section 1344 (bank fraud); Title 18, United States Code, Section 1341 (mail fraud); Title 18 United States Code, Section 157 (bankruptcy fraud); and Title 18, United States Code, Section 152 (concealing assets and false claims in bankruptcy proceedings).

9.      For the reasons set forth below, I further submit that there exists probable cause to believe that evidence, instrumentalities, and fruits of these offenses, as described in Attachment B, can be found at Brunner's residence at N39 W27051 Glacier Rd., Pewaukee, Wisconsin 53072.

### False draw requests to First Business Bank (bank fraud)

10.     Records obtained from First Business Bank-Milwaukee reflect as follows:

a.      On February 6, 2008, First Business Bank-Milwaukee approved the $2 million construction loan to Brunner doing business as Senior Community Center of Waupun, LLC for the purpose of converting the school building located in Waupun, Wisconsin into an assisted living residential facility. As collateral, Brunner pledged the building and two parcels of real estate, one located at 4226 W. Martin Dr. in Milwaukee, Wisconsin, titled to Brunner and the second, located at 2322 Lefeber Avenue, Wauwatosa, Wisconsin, titled to Investment

3

Specialists of Pewaukee, LLC. The loan was also guaranteed by Dennis Witthun and Robert Simonson.

b.       The revolving and term credit agreement for the loan specified, among other things, that no part of any advance under the loan will be used for personal, family or household purposes.

c.       Between approximately February 6, 2008 and August 2011, First Business Bank-Milwaukee issued checks and wires to Brunner based on construction loan draw requests which represented that the funds were payment or reimbursement for costs generated by the Waupun project.

11.      I have examined the checks and wires and the corresponding draw requests and I have interviewed representatives of various vendors that worked on the project. As a result, I have learned that on multiple occasions, Brunner diverted construction funds to venders and expenses not associated with the project and used the funds for improvements to his own real estate. The venders I spoke to include:

a.       Doc's Sewer and Water Company Inc. A representative confirmed that Doc's did receive a payment of $7,025.00 from Brunner on January 6, 2009, as represented in Brunner's draw request, but that the work covered by this payment was not performed on the Waupun project. Rather, the work was performed on other real estate owned by Brunner. Accordingly, Brunner's representation to First Business Bank-Milwaukee about the purpose of the draw was false and contrary to the revolving and term credit agreement.

b.       JEM Electric Inc. A representative confirmed that JEM did receive a payment of $7,000.00 from Brunner on or about February 26, 2009, as represented on Brunner's draw request, but that the work covered by this payment was not performed on the Waupun project. Rather, the work was performed on other real estate owned by Brunner. Accordingly, Brunner's representation to First Business Bank-Milwaukee about the purpose of the draw was false and contrary to the revolving term credit agreement.

c.       ABC Supply Company Inc. A representative stated that ABC did not receive a payment of $2,738.84 from Brunner Investment Specialists, as represented by the photocopy

4

of the check provided in Brunner's draw request. The representative stated that the materials reflected on the ABC invoices were not consistent with the materials for the Waupun project. Accordingly, Brunner's representation to First Business Bank-Milwaukee about the purpose of the draw and his payment to ABC were false.

d.       Lisbon Storm, Screen & Door Inc. A representative confirmed that it did receive a payment of $10,142.62 from Brunner, as represented in Brunner's draw request, but that only $8,416.93 of those funds was payment for material used in the Waupun project. The remainder of the funds represented payment for materials and labor which Lisbon provided and performed for other Brunner properties. Accordingly, Brunner's representation to First Business Bank-Milwaukee about the purpose of the draw was false and contrary to the revolving term credit agreement.

12.      I also interviewed Dennis Witthun, who was Brunner's business partner in the Waupun Project. Witthun reviewed the aforedescribed draw requests made by Brunner to First Business Bank-Milwaukee and confirmed that they were not legitimate claims for work done on the project.

13.      I also interviewed Katherine Kirkbride, Brunner's former office assistant and a tenant of one of his properties. Kirkbride represented that Brunner used construction funds drawn from the Waupun project to purchase a washer/dryer unit that he installed in her living unit.

14.      Based on the foregoing, I believe that there is probable cause to believe that Brunner made material misrepresentations to First Business Bank-Milwaukee in connection with construction loan draws and that this conduct constitutes bank fraud.

**Concealing assets from First Business Bank (bank fraud)**

15.      I have interviewed Dino Antonopoulos, an attorney representing First Business Bank-Milwaukee. Antonopoulos provided the following timeline for events which involve Brunner and First Business Bank-Milwaukee:

a.       On August 23, 2010, First Business Bank-Milwaukee, notified Brunner that the Waupun project construction loan was in default.

5

b.       During the summer and early fall of 2010, after First Business Bank-Milwaukee sent the default notice, Antonopoulos had discussions with Brunner and his attorney with the goal of resolving the default short of a lawsuit. During the discussions, Brunner represented that he did not own any properties "free and clear."

c.       In an effort to reach a resolution, First Business Bank-Milwaukee presented a forbearance agreement to Brunner and provided him with $5,000 to meet payroll on the Waupun project. Brunner took the payroll money but ultimately did not sign the agreement.

d.       On November 3, 2010, First Business Bank-Milwaukee filed a lawsuit against Brunner personally.

e.       In January 2011, First Business Bank-Milwaukee filed a foreclosure action against the Waupun property, the two additional properties pledged by Brunner, and also filed a lawsuit against the project guarantors, Witthun and Simonson.

f.       On March 15, 2011, First Business Bank-Milwaukee obtained a money judgment against Brunner for $2.2 million in Milwaukee County Circuit Case No. 2011-TJ000242.

g.       On June 5, 2011, Brunner filed his Petition for Chapter 11 Bankruptcy, effectively avoiding the First Business Bank judgment.

h.       In April 2012, the bankruptcy was dismissed and First Business Bank- Milwaukee began efforts to enforce its judgment against Brunner.

i.       In May 2012, a court appointed receiver was named to liquidate Brunner's property in satisfaction of the First Business Bank-Milwaukee judgment.

16.     Brunner's Bankruptcy disclosure statement admitted that during the nine months prior to the bankruptcy filing, Brunner transferred ownership of properties to Outer Limits and Thundercat Acquisitions to prevent the properties from being attached by creditors.

17.     I have obtained copies of quit claim property deeds from the recorder's offices for Milwaukee County and Waukesha County, including 85 deeds from Milwaukee County and 37 deeds from Waukesha County. A total of 115 of the 122 deeds transferring properties from Todd A. Brunner, Investment Specialists, or Brunner Joint Revocable Trust to other persons or entities were dated August 15, 2010. The deeds were recorded in Milwaukee and Waukesha Counties

6

between March 22, 2010, and November 23, 2010, with the August 15, 2010 deeds all recorded between October 5, 2010 and November 23, 2010. Ten deeds transferred property ownership to Shawn Brunner; 71 deeds transferred ownership to Outer Limits; 22 deeds transferred ownership to Thundercat Acquisitions; and four deeds transferred ownership from to Bulldog Enterprises, LLC. The transfer codes on the deeds reflect that the properties were transferred to an entity in which the transferor (Brunner) is a member.

18.    I am informed by an attorney from the Office of the U.S. Trustee that the Trustee's investigation determined that these transfers occurred with no consideration.

19.    I have researched these LLCs on the Wisconsin Department of Financial Institutions web site which reflects that the registered agent for Outer Limits Investments, LLC and Thundercat Acquisitions, LLC is Shawn Brunner, of N39W27051 Glacier Road, Pewaukee, Wisconsin who I know to be Todd Brunner's 22 year old son, a student at the University of Wisconsin, Whitewater. I have also determined that the registered agent for Bulldog Enterprises is Debra Kramer, the wife of an associate of Todd Brunner.

20    Based on my review of these deeds, my research with the Wisconsin Department of Financial Institutions web site, documents I obtained from the U.S. Trustee, and my interview of various witnesses I believe that Brunner may have an interest in or connection to all of the following LLCs: Investment Specialists of Pewaukee, LLC, Investment Specialists & Management LLC, T&D Acquisitions, LLC, Outer Limits, LLC, Thundercat Acquisitions, LLC, Peeling Paint, LLC, Land & Sea Acquisitions, LLC, Land & Sea Sales, LLC, Bulldog Enterprises, LLC, Senior Community Center of Waupun, LLC, and Senior Community Center Management of Waupun, LLC as well as unknown others.

21.    Testimony taken from Shawn Brunner by the attorney for the U.S. Trustee during the course of the bankruptcy proceedings reflect that Shawn Brunner claimed to be the actual owner of approximately 15 properties but he could not articulate where the properties were located nor describe any of his actual management of the properties.

22.    I interviewed Dennis Witthun whose name appears as the notary on the quit claim deeds transferring all of the properties referenced in paragraph 17. Witthun viewed the deeds and

7

informed me that they do not bear his signature, that he did not notarize the documents, and that he did not authorize Brunner to sign the documents with his name or to use his notary seal.

23. The transfer of these properties occurred during the time period leading up to and following notice by First Business Bank-Milwaukee that the Waupun construction loan was in default. The transfer to Thundercat Acquisitions also involved properties which Brunner owned free of any mortgage or lien, contrary to his representation to Antonopolous that he did not own any properties "free and clear." Witnesses, including Brunner's former secretary, Julie Sweet and his former business partner, Dion Droll, have described color coded file folders for the various properties which document which properties were transferred to Thundercat (burgundy), Shawn A. Brunner (purple), and additional properties that were transferred to T&D (Grey) and these witnesses have stated that these folders were maintained by Brunner at his home office at the Glacier Road address.

24. The time period and nature of the transfers, that is by quit claim deed executed with a forged notary signature and unauthorized seal, and transfer of the properties without consideration to LLC's created by Brunner and listed to his son and a personal associate, coupled with Brunner's bankruptcy disclosure statement to the effect that bad advice caused him to transfer the properties to protect them from creditors, leads me to believe that there is probable cause that Brunner's conduct was intended to conceal assets from First Business Bank-Milwaukee and thereby prevent First Business Bank-Milwaukee from attaching the properties in order to execute its judgment, and is conduct which constitutes bank fraud.

Concealing assets/ false statements/bankruptcy fraud

25 In the course of this investigation, I have conferred with Debra Schneider, Attorney for the United States Trustee, and I have reviewed portions of the Brunner's bankruptcy file. As the result of that investigation I learned the following:

a. A debtor in bankruptcy is required to file complete and accurate schedules of his or her assets at the time of the bankruptcy filing. Assets include but are not limited to cash, real estate, personal property, and rent receipts.

8

b.    On July 12, 2011, Brunner and his wife filed their debtor's schedule. The schedule was not complete and accurate and thereafter, they amended the schedule or portions thereof on seven separate occasions. These amendments occurred only after a third party or the Trustee learned of an asset or assets not included on the schedule.

c.    Assets which were not disclosed on the original schedule as required include, but are not limited to, ownership interest in four parcels of property in Bend, Oregon and properties in Milwaukee, Wisconsin, located at 4212 W. Hampton, 7010 W. Herbert, and 5838 North 41st Street. All of the Milwaukee properties were included for depreciation purposes on Brunner's 2007 and 2008 tax returns. Additionally, during the bankruptcy proceedings, the tenant at 7010 W. Herbert confirmed that Brunner had ownership interest in that property, as he personally collected rent at her residence, and represented to her that he had an ownership interest in the property.

d.    During the bankruptcy proceedings, Brunner testified under oath that he could not accurately report all of his rent receipts because his former secretary, Julie Sweet, failed to return necessary paperwork in good condition. He claimed that Sweet had "thrown documents into the snow," causing them to be ruined so that he needed to "start from scratch" and construct a tenant list based upon his memory.

e.    Contrary to Brunner's testimony, Sweet testified that she delivered Brunner's paper work to his residence on January 21, 2011 in plastic storage containers, after which she mailed his 2010 tenant rent books and a disc which contained complete tenant information to his home by certified mail. She produced two certified mail receipts showing that the packages had been received by Shawn Brunner on February 17, 2011.

f.    During the bankruptcy proceedings, the U.S. Trustee obtained other evidence that Brunner was fully aware of his actual assets. For example, Sweet testified that in March 2010, Brunner asked her to update his assets on a document entitled "Asset Sheet Project," which summarized the bulk of his assets as of March 2010. She testified that this asset list was among the items she sent to Brunner by certified mail in February 2011.

g.    Certified records obtained from Cornerstone Bank and Layton State

9

Bank reflect that properties that were on the asset list prepared by Sweet, but not disclosed on the bankruptcy schedule were identified to the banks on financial statements submitted in support of loan renewals at those financial institutions.

h. Records from Park Bank also suggest that in preparation for and during the course of the bankruptcy proceedings, Brunner was concealing cash rent receipts. Specifically, Park Bank provided documents, teller statements and bank surveillance video concerning a safe deposit box opened by Shawn Brunner prior to the bankruptcy filing. Surveillance videos reflect that on numerous occasions, just prior to and during the bankruptcy proceedings, Shawn Brunner, accompanied by his mother, Sharon Brunner, accessed the safety deposit box. On these occasions, Shawn Brunner arrived and left with a bag or a backpack. Tellers who assisted Shawn Brunner stated that on these occasions he either deposited or removed large amounts of U.S. currency from the safety deposit box. In testimony in during the bankruptcy proceedings, Shawn Brunner falsely testified this box was used only to store his parents' will and he did not deposit cash into it. Other witnesses, including Brunner's former employees Julie Sweet, Katherine Kirkbride and Louis Sutton have said that Brunner keeps cash in safes, including one located in the laundry room area of his home.

i. I have interviewed one of Brunner's former business partners, Dion Droll. Droll informed me that Brunner moved real estate assets out of his name by way of quit claim deed to avoid judgments against those assets and that he knows this because he and Brunner had discussions about doing so. According to Droll, Brunner instructed Julie Sweet to prepare a complete list of Brunner's assets, and that properties were then switched between various LLC's with unliened properties conveyed to Thundercat Acquisitions.

j. Droll advised that Brunner maintains a box of tenant receipts and related documents at his home and that original copies of the quit claim deeds transferring the properties will also be there. Droll also advised that Brunner has several notary seals at his home office, including seals that belong to other individuals.

26. On July 16, 2012, I interviewed Brunner at his residence, N39 W27051 Glacier Road, Pewaukee, Wisconsin 53072 at which time I also served him with a Federal Grand Jury

10

Subpoena requesting numerous documents related to this investigation. Brunner provided the following information:

a. Brunner was considering not retaining an attorney because he believed he did not need one and could not afford one. He heard about an FBI investigation, but was not sure that there was one. He wanted to talk about the allegations. He has records regarding his real estate dealings at his house. (He motioned around his office area.) He just found his 2008 tax return in his desk, and was trying to prepare his taxes. (He had represented to the bankruptcy court that he had not filed taxes for the years 2008 forward.)

b. Brunner does business as Investment Specialists and in the name of various other LLCs. He identified Outer Limits and Thundercat Acquisitions as his son's companies, and stated that there were others in which he, Brunner had an interest, but he did not name them.

c. Brunner admitted finding the records left by Julie Sweet, but claimed that he disclosed all of the pertinent documents to the bankruptcy court.

d. Brunner admitted notarizing documents as Dennis Witthun, but claimed they had a practice of using each other's notary authority.

e. Brunner stated that Dion Droll and others, including an attorney he met at a party, advised him to convey the properties to LLC's before bankruptcy, but that he quit-claimed the properties back when his bankruptcy attorney told him it was not the right thing to do.

f. During the interview, Brunner telephonically contacted his bankruptcy attorney Jonathan Goodman who told me that he did not represent Brunner for purposes of the FBI investigation. Brunner and Goodman agreed that I could pick up records introduced as bankruptcy exhibits at Goodman's office.

g. Several times during the interview, Brunner reiterated that he is "not a good bookkeeper."

h. I made an appointment to continue the interview.

i On July 17, 2012, I obtained a box of documents from attorney Goodman and I gave him a receipt for the same. Included in the box were ledgers for rent collections in 2006 and 2007, but none thereafter. To date, I have not received other records requested in the subpoena, and based upon evidence that Brunner had a pattern of concealing and withholding

11

information from the bankruptcy court, I do not believe that other items will be voluntarily forthcoming.

j.    I was unable to conduct the follow-up interview with Brunner as I was informed that he has now retained legal counsel in connection with this matter.

27.    Based on my on the foregoing, I believe that there is probable cause to believe that Brunner withheld relevant documents from the bankruptcy court and continues to withhold relevant documents and that he possesses documents which constitute evidence that he made material misrepresentations to First Business Bank-Milwaukee in order to obtain draws from his construction loan, that he concealed assets to prevent First Business Bank-Milwaukee from collecting on its lawfully obtained judgment against him, and that he made false statements to the bankruptcy court and concealed assets from the bankruptcy court in order to protect the assets from his secured and unsecured creditors, violations of the federal law, including Title 18, United States Code, Section 1344 (bank fraud); Title 18, United States Code, Section 1341 (mail fraud); Title 18, United States Code, section 157 (bankruptcy fraud); and Title 18, United States Code, section 152 (concealing assets and false claims in bankruptcy proceedings).

28.    I know based on my experience that it is common for people to maintain business records for tax and business reporting purposes in their home office and to store such records in other areas of their home including in basement or outbuilding storage areas and that such records are often maintained in both paper form and in computer files. For this reason, I submit that records and items described in Attachment B to the search warrant application and the proposed search warrant -- which would include records belonging to Brunner and to related entities, as well as assets, such as boats, cars, and cash, which were not disclosed in bankruptcy, are likely located in the home office and storage areas located in the residence and outbuilding at N39 W27051 Glacier Rd., Pewaukee, Wisconsin.

### Computers, Electronic Storage and Forensic Analysis

29.    As described above and in Attachment B, this application seeks permission to search for records and items found on the premises, in whatever form they are found. One form in which the records may be found is as data stored on a computer's hard drive or other storage media.

12

Thus, I request that the warrant authorize the seizure of electronic storage media, and/or, the copying of electronically stored information, all under Rule 41(e)(2)(B).

31. *Probable cause*: I submit that if a computer or storage medium is found on the premises, there is probable cause to believe that the records sought will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the files does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Accordingly, deleted files, or remnants of deleted files, may reside in free space or slack space--that is, in space on the storage medium that is not currently being used by an active file--for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media--in particular, computers' internal hard drives--contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. For example, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based upon actual inspection of other evidence related to this investigation and witness statements, including those of Brunner's former office staff, I am aware that computer equipment was used to generate, store and print documents that may be evidence of bank fraud,

13

mail fraud and bankruptcy fraud and that there is reason to believe that there is a computer system currently located on the premises.

30. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a work processing file.) Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and "chat" programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining the forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them and when.

14

d.      The process of identifying the exact files, blocks, registry entries, logs or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend upon other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, in the presence of absence of counter-forensic programs or anti-virus programs (and associated date) may be relevant to establishing the user's intent.

31.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's date, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of date either from accidental or intentional destruction. This is true because of the following:

a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can

15

take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-sites.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its date on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage formula that may require off-site reviewing with specialized forensic tools.

32. *Nature of examination.* Based on the foregoing and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the hard drive to human inspection in order to determine whether it is evidence described by the warrant.

33. Because several people share the premises as a residence, it is possible that the premises will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## Conclusion

34. For these reasons, I respectfully request that the Court issue a warrant authorizing the search of the property located at N37 W27031 Glacier Road, Pewaukee, Wisconsin, including all areas of the residence, the attached garages, the outbuilding, and any and all sheds, vehicles or motor craft located on the property, and the seizure of documents and records in whatever

16

form kept or stored, including documents or records that are maintained on computer hardware and software, and the seizure of other items which are evidence or fruits of the offenses set forth in paragraphs 8 and 27 above.

17